[No. S052844. July 24, 1997.]

JERRY H. BUSS et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
TRANSAMERICA INSURANCE COMPANY, Real Party in Interest.

## COUNSEL

Paul, Hastings, Janofsky & Walker, David M. Roberts, Grace A. Carter, Jennifer S. Baldocchi and Keith F. Millhouse for Petitioners.

Daniel E. Lungren, Attorney General, Jan S. Stevens, Assistant Attorney General, John A. Saurenman, Deputy Attorney General, Cotkins & Collins, Roger W. Simpson, Didak & Jack, Mark F. Didak, Thomas & Elliott, Stephen L. Thomas, Jay J. Elliott, Latham & Watkins, David L. Mulliken, Dorn G. Bishop, Diana L. Strauss, G. Andrew Lundberg, The Ford Law Firm, William H. Ford III, Claudia J. Serviss, Paul C. Cook, Irell & Manella, Gregory R. Smith, Thomas W. Johnson, Jr., Marc S. Maister, Harry A. Mittleman, Troop, Meisinger, Steuber & Pasich, Kirk A. Pasich, Lori Yankelevits, Brobeck, Phleger & Harrison, David M. Halbreich, Heller, Ehrman, White & McAuliffe, David B. Goodwin, Wayne S. Braveman, Munger, Tolles & Olson, Cary B. Lerman and Charles D. Siegal as Amici Curiae on behalf of Petitioners.

No appearance for Respondent.

Haines & Lea, John R. Brydon and James E. Gibbons for Real Party in Interest.

Kaufman & Logan, Jeffrey Kaufman, Nancy S. Coan, Paulette Donsavage, Wiley, Rein & Fielding, Laura A. Foggan, Lon A. Berk, Scott S. Harris, Sinnott, Dito, Moura & Puebla and Randolph P. Sinnott as Amici Curiae on behalf of Real Party in Interest.

Greines, Martin, Stein, & Richland and Robin Meadow as Amici Curiae.

## OPINION

MOSK, J.—We granted review to resolve certain issues relating to standard commercial general liability insurance policies, which were formerly called comprehensive general liability insurance policies.

The questions we shall address, and the answers we shall give, are these: First, may the insurer seek reimbursement from the insured for defense costs? Yes, as to claims that are not even potentially covered, but no, as to those that are. Second, for what specific costs may the insurer obtain reimbursement? Those that can be allocated solely to claims that are not

even potentially covered. Third, when the insurer seeks reimbursement, which party must carry the burden of proof? The insurer. Fourth and final, what is the burden of proof? Proof by a preponderance of the evidence.

## I

This cause arises from a petition for writ of mandate, etc., filed in the Court of Appeal for the Second Appellate District, and assigned to Division Three thereof. The petitioners are Jerry H. Buss and California Sports, Incorporated (hereafter collectively Buss); the respondent is the Superior Court of Los Angeles County; and the real party in interest is Transamerica Insurance Company (hereafter Transamerica).

Read in conjunction with all its supporting papers, the petition for writ of mandate contains allegations to the following effect.

H & H Sports, Incorporated, brought an action against Buss and others in the superior court. In the final amended form of its complaint, it alleged, in pertinent part, as follows: Buss owned and operated the Los Angeles Lakers, a professional basketball team, the Los Angeles Lazers, a professional indoor soccer team, and the Los Angeles Kings, a professional hockey team; through one entity, Buss owned and operated the Great Western Forum indoor sports arena in the City of Inglewood; through another entity, Buss leased the facility and presented athletic competitions, including professional basketball, indoor soccer, and hockey, and also entertainment events, and in addition subleased the facility to others who presented similar competitions and events; Buss owned and operated, at least indirectly and in part, certain cable television broadcasting networks, including the Forum Entertainment Network, Box Seat, and Prime Ticket Network; Buss entered into various contracts with H & H Sports, including certain modifications and extensions, under which H & H Sports provided, and Buss obtained, advertising and other services; for a time, Buss and H & H Sports performed under the contracts; subsequently, however, H & H Sports continued but Buss did not, with Buss unilaterally terminating his relationship with H & H Sports. H & H Sports asserted 27 causes of action (up from 12 originally), with most but not all against Buss and Buss-related persons and entities, titled substantially as follows: (1) breach of contract and breach of implied covenant of good faith and fair dealing; (2) breach of contract extension; (3) fraud and deceit; (4) constructive fraud; (5) intentional interference with economic relations; (6) negligent interference with economic relations; (7) conversion; (8) specific performance; (9) quantum meruit; (10) inducing breach of contract; (11) concealment of fact; (12) intentional interference with economic relations; (13) negligent interference with economic relations; (14) breach of contract and breach of implied covenant of good faith and fair

dealing; (15) inducing breach of contract; (16) intentional interference with economic relations; (17) negligent interference with economic relations; (18) breach of contract and breach of implied covenant of good faith and fair dealing; (19) breach of contract and breach of implied covenant of good faith and fair dealing; (20) inducing breach of contract; (21) intentional interference with economic relations; (22) negligent interference with economic relations; (23) defamation; (24) accounting; (25) constructive trust; (26) bad faith denial of existence of contract and contract modifications; and (27) bad faith denial of existence of contract.[1] H & H Sports prayed for relief including an award of $297,050,000 in damages by way of compensation (up from $72,050,000 originally), largely against Buss and Buss-related persons and entities.

Buss tendered defense of the H & H Sports action to his insurers. With the exception of Transamerica, each refused, denying coverage.

Transamerica had issued Buss two comprehensive or commercial general liability insurance policies pertinent to the H & H Sports action.

Transamerica's earlier, comprehensive general liability insurance policy provided in pertinent part: Transamerica "will pay on behalf of" Buss "all sums which" he "shall become legally obligated to pay as damages," up to a limit of $1 million per occurrence and $2 million in the aggregate, *either* "because of personal injury," meaning "injury arising out of one or more of" certain "offenses," including the "publication or utterance" of a "libel or slander or other defamatory or disparaging material," *or* "because of . . . advertising injury," meaning "injury arising out of an offense . . . occurring in the course of . . . advertising activities, if such injury arises out of," among other things, "libel, slander, [or] defamation . . . ." (Boldface omitted.) It also provided: Transamerica "shall have the . . . duty[2] to defend any suit against" Buss "seeking damages on account of such injury . . . ."

Similarly, Transamerica's later, commercial general liability insurance policy provided in pertinent part: Transamerica "will pay those sums that" Buss "becomes legally obligated to pay as damages," up to a limit of $1 million per occurrence and (apparently) in the aggregate, *either* "because of 'personal injury,'" meaning "injury . . . arising out of one or more of" certain "offenses," including the "[o]ral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services," *or* "because of . . . 'advertising injury,'" meaning "injury arising out of one or more of" certain "offenses,"

---

[1]Included among the 27 causes of action identified in the text was what may be called a "subsidiary" one for wrongful eviction against Buss.

[2]And the "right." (See fn. 27, *post.*)

including the "[o]ral or written publication of material" of the same description. It also provided: Transamerica "will have the . . . duty[3] to defend any 'suit,' " meaning a "civil proceeding," brought against Buss "seeking those damages."

Transamerica accepted the defense of the H & H Sports action as tendered by Buss, ultimately under both its comprehensive and commercial general liability insurance policies. As noted above, out of the 27 causes of action in the final amended form of the complaint, there was a single one for defamation against Buss: It was alleged that Buss made statements to third persons about H & H Sports that were "false and slanderous *per se*," and were "understood . . . to mean that [it] had overcharged its customers and lacked integrity." (Italics added in place of underscoring in original.) It was in light of such allegations that Transamerica agreed to defend Buss, ultimately taking the position that the defamation cause of action, and only the defamation cause of action, was at least potentially covered. But it reserved all its rights, including to deny that any cause of action was actually covered, and, "[w]ith respect to defense costs incurred or to be incurred in the future, . . . to be reimbursed and/or [to obtain] an allocation of attorney's fees and expenses in this action if it is determined that there is no coverage . . . ." Because of its reservation of rights and the conflict of interests arising therefrom, Transamerica agreed to pay on Buss's behalf the cost of independent *"Cumis"* counsel—so called after the eponymous decision of *San Diego Federal Credit Union* v. *Cumis Ins. Society, Inc.* (1984) 162 Cal.App.3d 358 [208 Cal.Rptr. 494, 50 A.L.R.4th 913]—in accordance with Civil Code section 2860. Buss acknowledged Transamerica's reservation of rights with a reservation of rights of his own. Later, Buss and Transamerica entered into an agreement supported by consideration that provided, among other things, that "[i]f a court . . . orders that defense costs be shared pro rata by . . . Buss . . . and Transamerica, . . . Buss . . . shall reimburse Transamerica for the appropriate pro rata share of the fees and costs paid to that date."

In due course, Buss settled the H & H Sports action, paying H & H Sports $8.5 million. Altogether, Transamerica paid Buss's independent counsel a sum stated variously as $1,066,000 and $1,004,018.11—with an amount ranging between $21,720 and $55,767.50, according to an expert retained by Transamerica, being the cost of defending the defamation cause of action. Buss had requested contribution to the settlement by Transamerica, but had been refused.

Buss brought the underlying action against Transamerica, among others, in the superior court. In the final amended form of his complaint, he alleged,

---

[3]And the "right." (See fn. 27, *post.*)

in pertinent part, that Transamerica denied any duty to defend the H & H Sports action in its entirety, and also denied any duty to contribute to the settlement thereof. He asserted causes of action entitled declaratory relief, breach of contract, and breach of the implied covenant of good faith and fair dealing. He prayed for relief including a declaration that Transamerica did indeed have a duty to defend and a duty to contribute, and an award of damages by way of compensation according to proof.

In a cross-complaint, Transamerica alleged, in pertinent part, that Buss denied its right to obtain reimbursement for the costs it expended to defend the H & H Sports action other than as to the defamation cause of action, and also denied its right not to contribute to the settlement thereof. It asserted causes of action, among others, entitled declaratory relief and declaratory relief and reimbursement. It prayed for relief including a declaration that it did indeed have a right to obtain reimbursement, and an order therefor in an amount to be proved at trial, and also a declaration that it did indeed have a right not to contribute to the settlement.

Transamerica moved the superior court for summary judgment against Buss on his complaint. The court granted the motion. Determining, among other things, that there was no "reasonable basis for Transamerica to join in the settlement" as to the defamation cause of action,[4] it concluded in substance that there was no triable issue of material fact and that Transamerica was entitled to judgment as a matter of law.

Buss then moved the superior court for summary judgment against Transamerica on its cross-complaint for reimbursement for defense costs. Relying ultimately on certain language in *Hogan* v. *Midland National Ins. Co.* (1970) 3 Cal.3d 553 [91 Cal.Rptr. 153, 476 P.2d 825] (hereafter sometimes *Hogan*), he effectively claimed, inter alia, that an insurer could not obtain reimbursement for defense costs from an insured unless it could prove by "undeniable evidence" (*id.* at p. 564) that certain costs could be allocated solely to claims that were not even potentially covered as opposed to those that were, and it could not carry that burden of proof unless it could invoke a prior "bright line event," such as an adjudication by the court or an agreement by the parties, separating claims that were not even potentially covered from those that were—conditions, he argued, that Transamerica could not satisfy. Determining, among other things, that *Hogan*'s "undeniable evidence" language was applicable by its own terms only "upon the wrongful refusal of an

---

[4]And that "Transamerica was not required to participate in the settlement of" the "subsidiary" cause of action for wrongful eviction, even though it was "facially covered," "because the known facts did not constitute wrongful eviction *as a matter of law*." (Italics added in place of underscoring in original.)

insurer to defend an action against its insured" (*ibid.*), a situation that did not obtain here, the court denied the motion.[5]

It was against the superior court and its denial of his summary judgment motion that Buss filed his petition for writ of mandate in the Court of Appeal. He also submitted a request for a stay of proceedings in the superior court pending determination thereof.

Evidently without a stay, the Court of Appeal ordered the parties to show cause why a peremptory writ of mandate should not issue. Transamerica filed opposition to Buss's petition. Buss filed a reply to Transamerica's opposition. The superior court did not appear.

In an opinion certified for publication, the Court of Appeal discharged the order to show cause[6] and denied a peremptory writ. It determined that the superior court's denial of Buss's summary judgment motion was subject to independent review. After such review, it found no error. In pertinent part, it concluded to the following effect: an insurer may not seek reimbursement from an insured for defense costs as to claims that are at least potentially covered—in the H & H Sports action, the defamation cause of action against Buss; it may, however, seek reimbursement for costs as to those that are not—in that action, all the others;[7] it may obtain reimbursement for the costs that can be allocated solely to these claims; to do so, it must carry the burden of proof; the burden it must carry is proof by a preponderance of the evidence; *Hogan*'s "undeniable evidence" language applies only when the insurer has wrongfully refused to defend the insured, which was not the case here.[8]

On Buss's petition and request, we granted review and stayed proceedings in the superior court pending determination thereof.

## II

Before we address the four questions relating to standard comprehensive or commercial general liability insurance policies stated at the outset, we

---

[5]Perfunctorily, and unsuccessfully, Buss argued that, even if *Hogan*'s "undeniable evidence" language was inapplicable, there was an independent requirement of a prior " 'bright line' event" for reimbursement.

[6]Inaccurately referred to as an alternative writ.

[7]The Court of Appeal concluded that the "subsidiary" cause of action for wrongful eviction was not even potentially covered. It rested on the superior court's determination (see fn. 4, *ante*) that, in light of the "known facts," this cause of action "did not constitute wrongful eviction *as a matter of law*." (Italics added in place of underscoring in original.)

[8]As in the superior court (see fn. 5, *ante*), Buss argued perfunctorily and unsuccessfully in the Court of Appeal that, even if *Hogan*'s "undeniable evidence" language was inapplicable, there was an independent requirement of a prior " 'bright line' event" for reimbursement.

must explicate the law that stands behind and beneath the answers we shall give.

A

■  An insurance policy is a contract between an insurer and an insured (e.g., *Montrose Chemical Corp.* v. *Admiral Ins. Co.* (1995) 10 Cal.4th 645, 666 [42 Cal.Rptr.2d 324, 913 P.2d 878]; *Bank of the West* v. *Superior Court* (1992) 2 Cal.4th 1254, 1264 [10 Cal.Rptr.2d 538, 833 P.2d 545]), the insurer making promises, and the insured paying premiums, the one in consideration for the other, against the risk of loss (e.g., *California Physicians' Service* v. *Garrison* (1946) 28 Cal.2d 790, 803-804 [172 P.2d 4, 167 A.L.R. 306]; *Headen* v. *Miller* (1983) 141 Cal.App.3d 169, 173 [190 Cal.Rptr. 198]; *Fraser-Yamor Agency, Inc.* v. *County of Del Norte* (1977) 68 Cal.App.3d 201, 213 [137 Cal.Rptr. 118]).

To yield their meaning, the provisions of a policy must be considered in their full context. (E.g., *Waller* v. *Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18-19 [44 Cal.Rptr.2d 370, 900 P.2d 619]; *Bank of the West* v. *Superior Court, supra,* 2 Cal.4th at p. 1265.) Where it is clear, the language must be read accordingly. (E.g., *Waller* v. *Truck Ins. Exchange, Inc., supra,* 11 Cal.4th at pp. 18-19; *Montrose Chemical Corp.* v. *Admiral Ins. Co., supra,* 10 Cal.4th at pp. 666-667; *Bank of the West* v. *Superior Court, supra,* 2 Cal.4th at p. 1264.) Where it is not, it must be read in conformity with what the insurer believed the insured understood thereby at the time of formation (e.g., *Montrose Chemical Corp.* v. *Admiral Ins. Co., supra,* 10 Cal.4th at p. 667; *Bank of the West* v. *Superior Court, supra,* 2 Cal.4th at pp. 1264-1265; *AIU Ins. Co.* v. *Superior Court* (1990) 51 Cal.3d 807, 822 [274 Cal.Rptr. 820, 799 P.2d 1253]) and, if it remains problematic, in the sense that satisfies the insured's objectively reasonable expectations (see, e.g., *Montrose Chemical Corp.* v. *Admiral Ins. Co., supra,* 10 Cal.4th at p. 667 [*semble*]; *Bank of the West* v. *Superior Court, supra,* 2 Cal.4th at p. 1265 [same]; *AIU Ins. Co.* v. *Superior Court, supra,* 51 Cal.3d at p. 822 [same]).

The provisions of a standard policy, like all others, must be so considered. Of course, when they are examined solely on a form, i.e., apart from any actual agreement between a given insurer and a given insured, the rules stated above apply *mutatis mutandis.* That is to say, where it is clear, the language must be read accordingly, and where it is not, in the sense that satisfies the hypothetical insured's objectively reasonable expectations.

■  Standard comprehensive or commercial general liability insurance policies provide, in pertinent part, that the insurer has a duty to indemnify the insured for those sums that the insured becomes legally obligated to pay as damages for any covered claim. They also provide that the insurer has a

duty[9] to defend the insured in any action brought against the insured seeking damages for any covered claim. It has been stated that, so far as the insured is concerned, the duty to defend may be as important as the duty to indemnify. (*Montrose Chemical Corp.* v. *Superior Court* (1993) 6 Cal.4th 287, 295-296 [24 Cal.Rptr.2d 467, 861 P.2d 1153]; see *Continental Cas. Co.* v. *Zurich Ins. Co.* (1961) 57 Cal.2d 27, 37 [17 Cal.Rptr. 12, 366 P.2d 455].)

The insurer's duty to indemnify runs to claims that are actually covered, in light of the facts proved. (E.g., *Montrose Chemical Corp.* v. *Admiral Ins. Co.*, *supra*, 10 Cal.4th at p. 659, fn. 9; *Armstrong World Industries, Inc.* v. *Aetna Casualty & Surety Co.* (1996) 45 Cal.App.4th 1, 107-108 [52 Cal.Rptr.2d 690].) By definition, it entails the payment of money in order to resolve liability. (*Continental Cas. Co.* v. *Zurich Ins. Co.*, *supra*, 57 Cal.2d at p. 36; *Financial Indem. Co.* v. *Colonial Ins. Co.* (1955) 132 Cal.App.2d 207, 211 [281 P.2d 883], disapproved on another point, *Continental Cas. Co.* v. *Zurich Ins. Co.*, *supra*, 57 Cal.2d at p. 38.) It arises only after liability is established. (E.g., *Montrose Chemical Corp.* v. *Admiral Ins. Co.*, *supra*, 10 Cal.4th at p. 659, fn. 9; *Armstrong World Industries, Inc.* v. *Aetna Casualty & Surety Co.*, *supra*, 45 Cal.App.4th at pp. 107-108.)

By contrast, the insurer's duty to defend runs to claims that are merely potentially covered, in light of facts alleged or otherwise disclosed. (E.g., *Montrose Chemical Corp.* v. *Superior Court*, *supra*, 6 Cal.4th at p. 295; *Gray* v. *Zurich Insurance Co.* (1966) 65 Cal.2d 263, 276-277 [54 Cal.Rptr. 104, 419 P.2d 168].) It entails the rendering of a service, viz., the mounting and funding of a defense (*Continental Cas. Co.* v. *Zurich Ins. Co.*, *supra*, 57 Cal.2d at p. 36; *Financial Indem. Co.* v. *Colonial Ins. Co.*, *supra*, 132 Cal.App.2d at p. 211, disapproved on another point, *Continental Cas. Co.* v. *Zurich Ins. Co.*, *supra*, 57 Cal.2d at p. 38) in order to avoid or at least minimize liability (see *Gray* v. *Zurich Insurance Co.*, *supra*, 65 Cal.2d at p. 279). It arises as soon as tender is made. (*Montrose Chemical Corp.* v. *Superior Court*, *supra*, 6 Cal.4th at p. 295.) It is discharged when the action is concluded. (*Ibid.*) It may be extinguished earlier, if it is shown that no claim can in fact be covered. (*Id.* at pp. 295, 300.) If it is so extinguished, however, it is extinguished only prospectively and not retroactively: before, the insurer had a duty to defend; after, it does not have a duty to defend further. (*Haskel, Inc.* v. *Superior Court* (1995) 33 Cal.App.4th 963, 977 [39 Cal.Rptr.2d 520]; *Hartford Accident & Indemnity Co.* v. *Superior Court* (1994) 23 Cal.App.4th 1774, 1781 [29 Cal.Rptr.2d 32].)

██    Obviously, the insurer's duty to defend is broader than its duty to indemnify. (E.g., *Montrose Chemical Corp.* v. *Superior Court*, *supra*, 6

---

[9]And a "right." (See also fns. 2 & 3, *ante*, & fn. 27, *post*.)

Cal.4th at p. 295; *Horace Mann Ins. Co.* v. *Barbara B.* (1993) 4 Cal.4th 1076, 1081 [17 Cal.Rptr.2d 210, 846 P.2d 792].) But, just as obviously, it is not unlimited. (*Waller* v. *Truck Ins. Exchange, Inc., supra,* 11 Cal.4th at p. 19.) It extends beyond claims that are actually covered to those that are merely potentially so—but no further. (*Ibid.*)[10]

Thus, in an action wherein all the claims are at least potentially covered, the insurer has a duty to defend. (*Hogan* v. *Midland National Ins. Co., supra,* 3 Cal.3d at p. 563 [*semble*]; see, e.g., *Horace Mann Ins. Co.* v. *Barbara B., supra,* 4 Cal.4th at pp. 1081-1087 [holding that the insurer has a duty to defend when only one of several claims is at least potentially covered].) This obligation is express in the policy's language. It rests on the fact that the insurer has been paid premiums by the insured for a defense. "The rule is grounded in basic principles of contract law." (*SL Industries* v. *American Motorists* (1992) 128 N.J. 188, 215 [607 A.2d 1266, 1280] [applying New Jersey law, but speaking generally].) The duty to defend is contractual. (E.g., *McMillin Scripps North Partnership* v. *Royal Ins. Co.* (1993) 19 Cal.App.4th 1215, 1220-1221 [23 Cal.Rptr.2d 243]; *Ins. Co. North America* v. *Forty-Eight Insulations* (6th Cir. 1980) 633 F.2d 1212, 1224, rehg. granted and opn. mod. in part not pertinent here and den. in part not pertinent here *sub nom. Ins. Co. of N.A.* v. *Forty-Eight Insulations* (6th Cir. 1981) 657 F.2d 814 [applying Illinois and New Jersey law, but speaking generally]; *SL Industries* v. *American Motorists, supra,* 128 N.J. at p. 215 [607 A.2d at p. 1280] [applying New Jersey law, but speaking generally].) "An insurer contracts to pay the entire cost of defending . . . claim[s]" that are at least potentially covered. (*Ins. Co. North America* v. *Forty-Eight Insulations, supra,* 633 F.2d at p. 1224 [applying Illinois and New Jersey law, but speaking generally]; accord, *SL Industries* v. *American Motorists, supra,* 128 N.J. at p. 215 [607 A.2d at p. 1280] [applying New Jersey law, but speaking generally].)

Conversely, in an action wherein none of the claims is even potentially covered, the insurer does not have a duty to defend. (E.g., *Waller* v. *Truck Ins. Exchange, Inc., supra,* 11 Cal.4th at p. 29; *Gray* v. *Zurich Insurance Co., supra,* 65 Cal.2d at p. 276, fn. 15.) This freedom is implied in the policy's language. It rests on the fact that the insurer has not been paid premiums by the insured for a defense. This "rule" too "is grounded in basic principles of contract law." (*SL Industries* v. *American Motorists, supra,* 128 N.J. at p. 215

---

[10]Read in context, language in certain decisions stating or implying that the duty to defend is "independent" of the duty to indemnify (e.g., *Gray* v. *Zurich Insurance Co., supra,* 65 Cal.2d at p. 274; *Financial Indem. Co.* v. *Colonial Ins. Co., supra,* 132 Cal.App.2d at p. 211, disapproved on another point, *Continental Cas. Co.* v. *Zurich Ins. Co., supra,* 57 Cal.2d at p. 38) means nothing more than that the former is broader than the latter. Both the duty to indemnify and the duty to defend are in fact dependent on coverage—the former on actual coverage, the latter on at least potential coverage.

[607 A.2d at p. 1280] [applying New Jersey law, but speaking generally].) As stated, the duty to defend is contractual. "The insurer has not contracted to pay defense costs" for claims that are not even potentially covered. (*Ins. Co. North America* v. *Forty-Eight Insulations*, *supra*, 633 F.2d at pp. 1224-1225 [applying Illinois and New Jersey law, but speaking generally]; accord, *SL Industries* v. *American Motorists*, *supra*, 128 N.J. at p. 215 [607 A.2d at p. 1280] [applying New Jersey law, but speaking generally].)

It follows that, in a "mixed" action, in which some of the claims are at least potentially covered and the others are not, the insurer has a duty to defend as to the claims that are at least potentially covered, having been paid premiums by the insured therefor, but does not have a duty to defend as to those that are not, not having been paid therefor. This conclusion is in line with the "general rule" that "[w]hen a complaint in an action . . . states different causes of action . . . against the insured, one of which is within . . . coverage . . . and others of which may not be, the insurer is bound to defend *with respect to those which, if proved, would be within . . . coverage.*" (Annot. (1955) 41 A.L.R.2d 434, 435, italics added and boldface omitted; accord, 14 Couch on Insurance (2d ed. 1982) § 51:47, p. 482.) As we ourselves have held more than once over the years (see *Waller* v. *Truck Ins. Exchange, Inc.*, *supra*, 11 Cal.4th at p. 19; *Gray* v. *Zurich Insurance Co.*, *supra*, 65 Cal.2d at p. 275), "the duty to defend, although broad, is not unlimited; it is measured by the nature and kinds of risks covered" (*Waller* v. *Truck Ins. Exchange, Inc.*, *supra*, 11 Cal.4th at p. 19; accord, *Gray* v. *Zurich Insurance Co.*, *supra*, 65 Cal.2d at p. 275).

Despite the foregoing, we have nevertheless held that, in a "mixed" action, the insurer has a duty to defend the action in its entirety. (*Horace Mann Ins. Co.* v. *Barbara B.*, *supra*, 4 Cal.4th at p. 1081; see *Hogan* v. *Midland National Ins. Co.*, *supra*, 3 Cal.3d at p. 563.) This holding is rooted in *Hogan*. (See *Horace Mann Ins. Co.* v. *Barbara B.*, *supra*, 4 Cal.4th at p. 1081; *California Union Ins. Co.* v. *Club Aquarius, Inc.* (1980) 113 Cal.App.3d 243, 247-248 [169 Cal.Rptr. 685].) But it is not explained in that decision or in any of its progeny.

We cannot justify the insurer's duty to defend the entire "mixed" action contractually, as an obligation arising out of the policy, and have never even attempted to do so. To purport to make such a justification would be to hold what we cannot—that the duty to defend exists, as it were, in the air, without regard to whether or not the claims are at least potentially covered. (See *Waller* v. *Truck Ins. Exchange, Inc.*, *supra*, 11 Cal.4th at p. 19; *Gray* v. *Zurich Insurance Co.*, *supra*, 65 Cal.2d at p. 275.) As stated, the duty to defend goes to any action seeking damages for any covered claim. If it went to an action *simpliciter*, it could perhaps be taken to reach the action *in its*

*entirety*. But it does not. Rather, it goes to an action *seeking damages for a covered claim*. It must therefore be read to embrace the action *to the extent that it seeks such damages*. So read, it accords with the general rule, set out above, that the insurer has a duty to defend as to the claims that are at least potentially covered, but not as to those that are not. (See 14 Couch on Insurance, *supra*, § 51:47, p. 482; Annot., *supra*, 41 A.L.R.2d at p. 435.) Even if the policy's language were unclear, the hypothetical insured could not have an objectively reasonable expectation otherwise.

That being said, we can, and do, justify the insurer's duty to defend the entire "mixed" action prophylactically, as an obligation imposed by law in support of the policy.[11] To defend meaningfully, the insurer must defend immediately. (*Montrose Chemical Corp.* v. *Superior Court*, *supra*, 6 Cal.4th at p. 295.) To defend immediately, it must defend entirely. It cannot parse the claims, dividing those that are at least potentially covered from those that are not. To do so would be time consuming. It might also be futile: The "plasticity of modern pleading" (*Gray* v. *Zurich Insurance Co.*, *supra*, 65 Cal.2d at p. 276) allows the transformation of claims that are at least potentially covered into claims that are not, and vice versa. The fact remains: As to the claims that are at least potentially covered, the insurer gives, and the insured gets, just what they bargained for, namely, the mounting and funding of a defense. But as to the claims that are not, the insurer may give, and the insured may get, more than they agreed, depending on whether defense of these claims necessitates any additional costs.

B

We now turn to the first question—In a "mixed" action, may the insurer seek reimbursement from the insured for defense costs?

The answer is as follows.

As to the claims that are at least potentially covered, the insurer may not seek reimbursement for defense costs. Apparently, none of the decisional law considering such claims in and of themselves suggests otherwise.

The reason is this. Under the policy, the insurer has a duty to defend the insured as to the claims that are at least potentially covered. With regard to defense costs for these claims, the insurer has been paid premiums by the insured. It bargained to bear these costs. To attempt to shift them would

---

[11]Compare *Scottsdale Ins.* v. *Homestead Land Development* (N.D.Cal. 1992) 145 F.R.D. 523, 532 (stating that "[o]ver the past four decades California courts have sought to articulate doubt resolution rules that substantially reduce the likelihood that individual insureds will be left defenseless as a result of apparently self-serving decisions by carriers to deny a duty to defend pending resolution of substantive coverage issues").

upset the arrangement. (See *Val's Painting & Drywall, Inc.* v. *Allstate Ins. Co.* (1975) 53 Cal.App.3d 576, 582-585 [126 Cal.Rptr. 267].) This would not be the case if the policy itself provided for reimbursement: such a policy would qualify itself. It would also not be the case if there were a separate contract supported by separate consideration: Such a contract would supersede the policy pro tanto. Otherwise, however, the insurer may not seek reimbursement. Surely, it does not have a right of reimbursement implied in fact in the policy, having bargained to bear the costs in question. Neither does it have such a right implied in law. Under the law of restitution, a right of this sort runs against the person who benefits from "unjust enrichment" and in favor of the person who suffers loss thereby. (See Rest., Restitution § 1, coms. a, c, & d, at pp. 12 & 13; accord, Rest.2d Restitution (Tent. Draft No. 1, Apr. 5, 1983) § 1, pp. 8-9.) Any "enrichment" of the insured by the insurer through the insurer's bearing of bargained-for defense costs is consistent with the insurer's obligation under the policy and therefore cannot be deemed "unjust." It follows a fortiori that the insurer may not proceed by means of a "reservation" of its "right" of reimbursement. It simply has no such "right" to "reserve." That is true even if the insured agrees to the "reservation." The creation of a right of reimbursement would amount to a pro tanto supersession of the policy—which would require a separate contract supported by separate consideration. (*Reliance Ins. Co.* v. *Alan* (1990) 222 Cal.App.3d 702, 710, fn. 4 [272 Cal.Rptr. 65].)[12]

As to the claims that are not even potentially covered, however, the insurer may indeed seek reimbursement for defense costs. Apparently, all the decisional law considering such claims in and of themselves so assumes. (See, e.g., *Hogan* v. *Midland National Ins. Co.*, *supra*, 3 Cal.3d at pp. 563-564; *American Motorists Ins. Co.* v. *Allied-Sysco Food Services, Inc.*, *supra*, 19 Cal.App.4th at pp. 1355-1356; *Reliance Ins. Co.* v. *Alan, supra*, 222 Cal.App.3d at pp. 708-710; *Insurance Co. of the West* v. *Haralambos Beverage Co.*, *supra*, 195 Cal.App.3d at pp. 1322-1323; *Travelers Ins. Co.* v. *Lesher, supra*, 187 Cal.App.3d at p. 203; *Western Employers Ins. Co.* v. *Arciero & Sons, Inc.* (1983) 146 Cal.App.3d 1027, 1028-1029, 1032 [194 Cal.Rptr. 688]; *Walbrook Ins. Co. Ltd.* v. *Goshgarian & Goshgarian* (C.D.Cal. 1989) 726 F.Supp. 777, 781-784 [applying California law]; *Omaha Indem. Ins. Co.* v. *Cardon Oil Co.* (N.D.Cal. 1988) 687 F.Supp. 502, 504-505, affd. (9th Cir. 1990) 902 F.2d 40 [same]; accord, *Ins. Co. North*

---

[12]To the extent that certain Court of Appeal decisions may be read to suggest that the insurer may indeed proceed by means of a "reservation" of its "right" of reimbursement, at least if the insured agrees thereto (see *American Motorists Ins. Co.* v. *Allied-Sysco Food Services, Inc.* (1993) 19 Cal.App.4th 1342, 1355-1356 [24 Cal.Rptr.2d 106]; *Insurance Co. of the West* v. *Haralambos Beverage Co.* (1987) 195 Cal.App.3d 1308, 1322-1323 [241 Cal.Rptr. 427]; *Travelers Ins. Co.* v. *Lesher* (1986) 187 Cal.App.3d 169, 203 [231 Cal.Rptr. 791]), they are unsound for the reasons stated in the text and are hereby disapproved.

*America* v. *Forty-Eight Insulations*, *supra*, 633 F.2d at pp. 1224-1225 [applying Illinois and New Jersey law, but speaking generally].) So has it been held: "California law clearly allows insurers to be reimbursed for attorney's fees" and other expenses "paid in defending insureds against claims for which there was no obligation to defend." (*Omaha Indem. Ins. Co.* v. *Cardon Oil Co.*, *supra*, 687 F.Supp. at p. 504.)

The reason is this. Under the policy, the insurer does not have a duty to defend the insured as to the claims that are not even potentially covered. With regard to defense costs for these claims, the insurer has not been paid premiums by the insured. It did not bargain to bear these costs. To attempt to shift them would not upset the arrangement. (See *Ins. Co. North America* v. *Forty-Eight Insulations*, *supra*, 633 F.2d at pp. 1224-1225 [applying Illinois and New Jersey law, but speaking generally].) The insurer therefore has a right of reimbursement that is implied in law as quasi-contractual, whether or not it has one that is implied in fact in the policy as contractual.[13] As stated, under the law of restitution such a right runs against the person who benefits from "unjust enrichment" and in favor of the person who suffers loss thereby. The "enrichment" of the insured by the insurer through the insurer's bearing of unbargained-for defense costs is inconsistent with the insurer's freedom under the policy and therefore must be deemed "unjust." It is like the case of *A* and *B*. *A* has a contractual duty to pay *B* $50. He has only a $100 bill. He may be held to have a prophylactic duty to tender the note. But he surely has a right, implied in law if not in fact, to get back $50. Even if the policy's language were unclear, the hypothetical insured could not have an objectively reasonable expectation that it was entitled to what would in fact be a windfall. (See *Morgan, Lewis & Bockius LLP* v. *Hanover Ins. Co.* (D.N.J. 1996) 929 F.Supp. 764, 771 [applying New Jersey law, but

[13]That the insurer does not have a right of reimbursement express in the policy does not mean that it does not have one implied in law. Rather, that it has an implied-in-law right helps explain why it does not have an express-in-policy one. The former renders the latter unnecessary. This is proved by the fact that, with an implied-in-law right and without an express-in-policy one, insurers have sought, and obtained, reimbursement—and have done so, on the evidence of reported decisions, for much more than a decade (see *Western Employers Ins. Co.* v. *Arciero & Sons, Inc.*, *supra*, 146 Cal.App.3d at pp. 1028-1029, 1032 [not involving a "mixed" action]). To be sure, an express right could have been introduced into the policy. (Cf. *Aetna Cas. & Surety Co.* v. *Certain Underwriters* (1976) 56 Cal.App.3d 791, 801 [129 Cal.Rptr. 47] [" 'How simple it would have been to amend the standard language[.]' "].) But that it was not is not dispositive.

By stating that the insurer has a right of reimbursement that is implied in law, *whether or not it has one that is implied in fact in the policy*, we should not be taken to imply that the unresolved issue set out in the italicized clause should indeed be resolved in the negative. For example, as a general matter at least, one may infer that a party to a contract has an implied-in-fact right to bring an action for damages in case of breach. Apparently, he could similarly infer that the insurer has a right of reimbursement of the same kind. Buss's assertion notwithstanding, such a right need not have a locus in a specific provision.

speaking generally]; see also *E.E.O.C.* v. *Southern Pub. Co., Inc.* (5th Cir. 1990) 894 F.2d 785, 791 [apparently applying Mississippi law, but speaking generally].) Whatever hopes such an insured may have had based on the decisional law's imposition on the insurer of a duty to defend the entire "mixed" action would have been dispelled by that same law's assumption that the insurer may seek reimbursement for the kind of costs identified above. (Cf. *Johansen* v. *California State Auto. Assn. Inter-Ins. Bureau* (1975) 15 Cal.3d 9, 19 [123 Cal.Rptr. 288, 538 P.2d 744] [stating that "[i]f, having reserved" "its right to assert a defense of noncoverage" and "having accepted a reasonable [settlement] offer, the insurer subsequently establishes the noncoverage of its policy, it would be free to seek reimbursement of the settlement payment from its insured"]; *Maryland Casualty Co.* v. *Imperial Contracting Co.* (1989) 212 Cal.App.3d 712, 720-722 [260 Cal.Rptr. 797] [concluding to that effect].)[14]

Not only is it good law that the insurer may seek reimbursement for defense costs as to the claims that are not even potentially covered, but it also makes good sense. Without a right of reimbursement, an insurer might be tempted to refuse to defend an action in any part—especially an action with many claims that are not even potentially covered and only a few that are—lest the insurer give, and the insured get, more than they agreed. With such a right, the insurer would not be so tempted, knowing that, if defense of

---

[14]We recognize that a group of Court of Appeal decisions, which were apparently followed by the Court of Appeal below, hold that the insurer does not have a right of reimbursement against the insured that is implied in law as quasi-contractual. (See *Reliance Ins. Co.* v. *Alan, supra,* 222 Cal.App.3d at p. 709; *Insurance Co. of the West* v. *Haralambos Beverage Co., supra,* 195 Cal.App.3d at p. 1323; *Travelers Ins. Co.* v. *Lesher, supra,* 187 Cal.App.3d at pp. 203-204.) Their rationale is this: "Among settled principles of restitution is that a person who, incidental to the performance of his own duty or to the protection of his own things, has conferred a benefit upon another, is not thereby entitled to contribution. [Citation.] The insurer who is uncertain whether coverage is provided under a policy undertakes the defense of its insured under a reservation of rights in large part to protect *itself* from a subsequent claim that it breached its agreement with the insured. [Citation.] Although the assumption of the defense by the insurer without doubt also benefits the insured, it is not primarily undertaken for the insured's benefit." (*Travelers Ins. Co.* v. *Lesher, supra,* 187 Cal.App.3d at pp. 203-204, original italics; accord, *Reliance Ins. Co.* v. *Alan, supra,* 222 Cal.App.3d at p. 709; *Insurance Co. of the West* v. *Haralambos Beverage Co., supra,* 195 Cal.App.3d at p. 1323.) Such reasoning fails. It turns on motive. Motive, however, is "hard . . . to discern." (*Della Penna* v. *Toyota Motor Sales, U.S.A., Inc.* (1995) 11 Cal.4th 376, 405 [45 Cal.Rptr.2d 436, 902 P.2d 740] (conc. opn. of Mosk, J.).) "That is true . . . [as to] an individual: a person's mind and heart typically reveal themselves and conceal themselves at one and the same time. It is truer still . . . [as to] a group of individuals: many minds and hearts are then involved, and they cannot simply be added up. And, of course, it is truest . . . [as to] a corporation or similar entity"—like an insurer: "the 'mind' and 'heart' of such a one is purely fictive." (*Ibid.*) The analysis in the text does not attempt to fathom why the insurer acts as it does subjectively, but merely looks to what results from its action objectively. To the extent that they are to the contrary, the Court of Appeal decisions cited above are unsound, and are hereby disapproved.

the claims that are not even potentially covered should necessitate any additional costs, it would be able to seek reimbursement.

## C

The second question, which follows from the first, is this: In a "mixed" action, for what specific defense costs may the insurer obtain reimbursement from the insured?

The answer is: Defense costs that can be allocated solely to the claims that are not even potentially covered.

The reason is this. It is as to defense costs that can be allocated solely to the claims that are not even potentially covered that the insurer has not been paid premiums by the insured. By contrast, the insurer has in fact been paid as to costs that can be allocated solely to the claims that are at least potentially covered. So too as to costs that can be allocated jointly to the claims that are at least potentially covered and to those that are not—by definition, these costs are fully attributable to the former as well as the latter.[15]

## D

The third question, which follows from the second, is this: In a "mixed" action, when the insurer seeks reimbursement for defense costs from the insured, which party must carry the burden of proof?

The answer is: It is the insurer that must carry the burden of proof.

The reason is this. Evidence Code section 500 provides that, generally, a party desiring relief must carry the burden of proof thereon. We can find no exception for an insurer seeking reimbursement for defense costs. We will create none.

## E

The fourth and final question, which follows from the third, is this: In a "mixed" action, what is the burden of proof that the insurer must carry in order to obtain reimbursement for defense costs from the insured?

---

[15]The Court of Appeal put it thus: "Lest there be any confusion on the point, we emphasize that the insurer is required to prove that the defense costs which it seeks to recover were not reasonably related to any actually or potentially covered claims. Defense costs which were required in any event or would have been incurred in order to defend actually or potentially covered claims, whether or not joined with noncovered claims, cannot be recovered. An insurer is only entitled to recover those defense expenses which can be fairly and reasonably allocated *solely* to noncovered claims for which there never was any potential for coverage." (Original italics.)

The answer is: The burden of proof is proof by a preponderance of the evidence.

The reason is this. Evidence Code section 115 identifies four increasingly heavy burdens of proof: the raising of a reasonable doubt; proof by a preponderance of the evidence; proof by clear and convincing evidence; and proof beyond a reasonable doubt. It provides that the burden of proof that is generally applicable is proof by a preponderance of the evidence. Of course, this burden is the "ordinary" one for civil actions. (*Weiner* v. *Fleischman* (1991) 54 Cal.3d 476, 490 [286 Cal.Rptr. 40, 816 P.2d 892]; accord, *Bertero* v. *National General Corp.* (1974) 13 Cal.3d 43, 63 [118 Cal.Rptr. 184, 529 P.2d 608, 65 A.L.R.3d 878].) It is applicable to contractual causes of action. (See, e.g., *Pugh* v. *See's Candies, Inc.* (1988) 203 Cal.App.3d 743, 760, 765 [250 Cal.Rptr. 195].) It is also applicable to quasi-contractual ones. (Cf. *ibid.* [dealing with cause of action for breach of implied—specifically, implied-in-law—covenant of good faith and fair dealing].) It is not inappropriate here, where the insurer seeks reimbursement for defense costs, resting on a right that is implied in law as quasi-contractual, whether or not it is implied in fact in the policy as contractual. (*Scottsdale Ins.* v. *Homestead Land Development*, *supra*, 145 F.R.D. at pp. 529-533 [applying California law].)

Against our conclusion that the burden of proof that the insurer must carry in order to obtain reimbursement for defense costs is proof by a preponderance of the evidence, Buss invokes the law. Specifically, he argues that, under *Hogan*, the burden of proof that the insurer must carry is "undeniable evidence," and that it can do so only if it can point to a prior "watershed event"—what he formerly called a " 'bright line' event"—separating the claims that are not even potentially covered from those that are.

In *Hogan*—which we must now review in some detail—Midland National Insurance Company (hereafter Midland) issued a liability insurance policy to Diehl Machines, Inc. (hereafter Diehl). (*Hogan* v. *Midland National Ins. Co.*, *supra*, 3 Cal.3d at p. 557.) The policy provided that Midland had a duty to indemnify Diehl for those sums that Diehl became legally obligated to pay as damages for accidental property injury. (*Id.* at pp. 557, 558.) It also provided that Midland had a duty to defend Diehl in any action brought against Diehl seeking damages for such injury. (*Id.* at p. 558.)

William F. Kaufman and Evelyn Kaufman (hereafter collectively Kaufman) brought an action for damages against Diehl, alleging, inter alia, that they had bought a saw it manufactured for use in their lumber business, the item proved to be defective, and it caused them to suffer substantial monetary loss. (*Hogan* v. *Midland National Ins. Co.*, *supra*, 3 Cal.3d at p. 557.) Diehl tendered the defense. (See *ibid.*) Midland refused on the ground that

the action did not seek damages for any covered claim. (*Ibid.*) Diehl undertook to defend the action itself, and was found liable. (*Ibid.*) It assigned its cause of action against Midland to one Robert V. Hogan. (*Ibid.*)

Hogan then brought an action against Midland seeking damages for both the defense costs expended by Diehl in the Kaufman action and the damages assessed against it therein. (*Hogan* v. *Midland National Ins. Co., supra,* 3 Cal.3d at p. 557.) At trial, he largely prevailed, obtaining all the defense costs and most of the damages in a judgment in his favor. (*Id.* at pp. 557, 563-564.)

On appeal in the Hogan action, Midland contended that it did not have a duty to indemnify Diehl for all the damages assessed in the Kaufman action. (*Hogan* v. *Midland National Ins. Co., supra,* 3 Cal.3d at pp. 557-558.) We agreed, and reversed the judgment in that part. (*Id.* at pp. 558, 559-563, 564-566.) We concluded that, although all the claims as alleged were at least potentially covered, some of the claims as proved were not actually covered. (*Id.* at pp. 563 & 563-564, fn. 7.)

Midland also contended that it did not have a duty to defend Diehl in the Kaufman action, that if it had such a duty as to any claims, it had it only as to those that were actually covered as opposed to those that were potentially so, and that, accordingly, it was responsible for the defense costs only in such proportion as the damages for the claims that were actually covered bore to the damages in their totality. (*Hogan* v. *Midland National Ins. Co., supra,* 3 Cal.3d at pp. 558, 563.) We disagreed, and affirmed the judgment in that part. (*Id.* at pp. 563-564, 566.) We concluded that Midland did indeed have a duty to defend, that its refusal of the defense was therefore wrongful, and hence that it was responsible for all the defense costs. (*Id.* at pp. 558, 563-564.) This determination was compelled by the one stated above, viz., that all the claims as alleged were at least potentially covered. (See *id.* at pp. 563 & 563-564, fn. 7.) In the course of our discussion, we stated as follows:

██ "The cases which have considered apportionment of attorneys' fees upon the wrongful refusal of an insurer to defend an action against its insured generally have held that the insurer is liable for the total amount of the fees despite the fact that some of the damages recovered in the action against the insured were outside the coverage of the policy. [Citations.]

"In its pragmatic aspect, any precise allocation of expenses in this context would be extremely difficult and, if ever feasible, could be made only if the insurer produces undeniable evidence of the allocability of specific expenses; the insurer having breached its contract to defend should be charged with a heavy burden of proof of even partial freedom from liability for harm to the insured which ostensibly flowed from the breach. (See Annot. in 41

A.L.R.2d 434, 438.)[16] Diehl sought to absolve itself of any liability for Kaufman's damages, regardless of whether or not such damages were covered by the policy. Midland does not suggest how a determinable portion of the attorneys' fees expended by Diehl in this effort could be allocated to the damages suffered by Kaufman as a result of accident." (*Hogan* v. *Midland National Ins. Co., supra,* 3 Cal.3d at p. 564.)

When we consider *Hogan's* "undeniable evidence" language in its full context, we arrive at the following conclusions. First, it is dictum and not holding: Midland was responsible for all Diehl's defense costs in the Kaufman action because all the claims as alleged were at least potentially covered. Second, it is dictum that purports to impose a burden of proof that is apparently otherwise unknown to the law, and that is seemingly even heavier than proof beyond a reasonable doubt.[17] Third, it is dictum that is altogether silent as to any requirement of a prior "watershed event."[18] Fourth, it is dictum that, in line with its limited scope, is concerned with

---

[16]In cited part, Annotation, *supra,* 41 A.L.R.2d at page 438, is as follows: "[P]recise allocation of expenses in this sort of situation would, as a practical matter, be extremely difficult. And the comment may be made that allocation, if ever feasible, should be made only where the insurer brings forth clear evidence of the allocability of specific expenses; the insurer, having breached its contract to defend, should be charged with a heavy burden of proof of even partial freedom from liability for harm to the insured which ostensibly flowed from the breach."

[17]Apparently recognizing the weakness of his position, Buss concedes, in words he quotes from the Court of Appeal below, that *Hogan's* " 'undeniable evidence standard is not a burden of proof as we ordinarily think of that term . . . [.]' " He immediately goes on to assert: "[W]hat the 'undeniable evidence' standard does reflect is a *qualitative* judgment on the *type* of evidence required to show allocability, not a *quantitative* judgment on whether the insurer has produced a sufficient quantum of evidence . . . ." (Italics added in place of underscoring in original.) His assertion is without support in *Hogan* and, for that reason, falls under its own weight.

We note that *Hogan's* phrase, "*undeniable* evidence" (*Hogan* v. *Midland National Ins. Co., supra,* 3 Cal.3d at p. 564, italics added), is *not* derived from the cited annotation, which uses the phrase, "*clear* evidence" (Annot., *supra,* 41 A.L.R.2d at p. 438, italics added, quoted in fn. 16, *ante*). Whereas the former suggests a novel burden of proof, the latter suggests a common one, viz., proof by clear and convincing evidence.

[18]To the extent that the post-*Hogan* decisional law supports any requirement of a prior "watershed event," it does so only on the question of the insurer's ability to extinguish its duty to defend. (See, e.g., *Horace Mann Ins. Co.* v. *Barbara B., supra,* 4 Cal.4th at p. 1086 [stating that, "when the underlying action is a sham, the [defending] insurer can demur or obtain summary judgment on its insured's behalf and thereby obviate the necessity of further defense"]; *Ohio Casualty Ins. Co.* v. *Hubbard* (1984) 162 Cal.App.3d 939, 941-948 [208 Cal.Rptr. 806] [implying that a valid judgment declaring that none of the claims in the underlying action is even potentially covered releases the defending insurer from any duty to defend further]; *California Union Ins. Co.* v. *Club Aquarius, Inc., supra,* 113 Cal.App.3d at pp. 247-248 [holding that a determination after the liability phase of a bifurcated trial that the insured is liable solely for claims that are not covered releases the defending insurer from any duty to defend in the damages phase thereof].) See also footnote 20, *post.*

We note that Buss does not argue here, as he did in the superior court and the Court of Appeal (see fns. 5 and 8, *ante*), that, even if *Hogan's* "undeniable evidence" language is

reduction of defense costs that the insurer has not paid, and not with reimbursement for defense costs that it has. Fifth and final, it is dictum that is applicable, in accordance with its own terms, "upon the wrongful refusal of an insurer to defend an action against its insured" (*Hogan* v. *Midland National Ins. Co., supra,* 3 Cal.3d at p. 564),[19] and not upon the proper agreement of an insurer to do so.[20]

Against our conclusion that the burden of proof that the insurer must carry in order to obtain reimbursement for defense costs is proof by a preponderance of the evidence, Buss also invokes policy. His points are several.

Buss argues, first and most forcefully, that subjecting the insurer seeking reimbursement for defense costs to a burden of proof no heavier than proof by a preponderance of the evidence will "open the floodgates . . . [of] litigation," and will cause the courts to be inundated with reimbursement requests both numerous and complex, involving insurers and their counsel, insureds and *their* counsel, perhaps excess insurers and *their* counsel, and so on. We are doubtful. To begin with, the "floodgates" have been open for quite some time—on the evidence of reported decisions, much more than a decade (see *Western Employers Ins. Co.* v. *Arciero & Sons, Inc., supra,* 146 Cal.App.3d at pp. 1028-1029, 1032 [not involving a "mixed" action]). During this period, the courts have not been inundated with reimbursement requests either numerous or complex—again on the evidence of reported decisions, only a relatively few simple ones (see *ibid.* [same]). This state of affairs does not seem likely to change. An insurer may obtain reimbursement *only* for defense costs that can be allocated *solely* to the claims that are not even potentially covered. To do that, it must carry the burden of proof as to

---

inapplicable, there is an independent requirement of a prior "watershed event" for reimbursement. As is apparent from the preceding paragraph, any such argument would fail.

[19]Accord, e.g., *Bertero* v. *National General Corp., supra,* 13 Cal.3d at page 63; *Scottsdale Ins.* v. *Homestead Land Development, supra,* 145 F.R.D. at page 531 (applying California law).

[20]*Hogan*'s "undeniable evidence" language is quoted or paraphrased in subsequent decisions, but usually, and somewhat curiously, on the question of the insurer's ability to extinguish its duty to defend. (See, e.g., *Horace Mann Ins. Co.* v. *Barbara B., supra,* 4 Cal.4th at p. 1081 [stating in dictum that, "[o]nce the defense duty attaches, the insurer is obligated to defend against all of the claims involved in the action, both covered and noncovered, until the insurer produces undeniable evidence supporting an allocation of a specific portion of the defense costs to a noncovered claim"]; *American Motorists Ins. Co.* v. *Allied-Sysco Food Services, Inc., supra,* 19 Cal.App.4th at pp. 1353-1354 [quoting *Horace Mann*'s dictum]; *Ohio Casualty Ins. Co.* v. *Hubbard, supra,* 162 Cal.App.3d at p. 944 [quoting *Hogan*'s "undeniable evidence" dictum]; *California Union Ins. Co.* v. *Club Aquarius, Inc., supra,* 113 Cal.App.3d at p. 248 [same].) The Court of Appeal below effectively read such decisions to anticipate our holding (*Montrose Chemical Corp.* v. *Superior Court, supra,* 6 Cal.4th at pp. 295, 300) that the duty to defend may be extinguished if it is shown that no claim can in fact be covered. See also footnote 18, *ante.*

these costs by a preponderance of the evidence. And to do *that*, as we said in *Hogan*, it must accomplish a task that, "if ever feasible," may be "extremely difficult." (*Hogan* v. *Midland National Ins. Co.*, *supra*, 3 Cal.3d at p. 564.)[21] Hence, the insurer will probably pursue the matter only in apparently exceptional cases—for example, where the defense costs the insurer may obtain in reimbursement are clear and substantial *and* where the assets the insured has available for reimbursement are themselves of the same sort. Of course, the future may bring more numerous and/or more complex requests than we envision. Such an eventuality could be forestalled were we simply to deny the right of reimbursement outright or hedge it about with *Hogan's* "undeniable evidence" language. But the possible invocation of this right —or any other—is not a sufficient basis for its abrogation or disapproval.

Buss next argues that subjecting the insurer seeking reimbursement for defense costs to a burden of proof no heavier than proof by a preponderance of the evidence will undermine the defense the insured receives by chilling the representation its counsel provides. We do not discern the threat of any substantial adverse effect as to defense. That is because we do not discern any such threat as to representation. The insured's counsel remains free to represent the insured as he sees fits, subject only to generally applicable legal provisions and professional standards.[22]

Buss then argues that subjecting the insurer seeking reimbursement for defense costs to a burden of proof no heavier than proof by a preponderance of the evidence will encourage the insurer to offer, and compel the insured to accept, a modification of the duty to defend the entire "mixed" action into an obligation to defend only the claims that are at least potentially covered, in exchange for a waiver of the right of reimbursement. As a matter of law, if a modification of this sort is agreeable to the parties, a stranger to the contract should generally not be heard to complain. As a matter of fact, modifications of this sort do not appear to be likely. What we stated above may be restated here. The insurer has a duty to *defend*, i.e., to mount and fund a defense. This obligation arises out of the policy. It has a duty to

[21]Although it may be "extremely difficult" for the insurer to carry its burden of proof (*Hogan* v. *Midland National Ins. Co.*, *supra*, 3 Cal.3d at p. 564), the determination as to whether or not it succeeds is well within the judicial capacity (see *SL Industries* v. *American Motorists*, *supra*, 128 N.J. at pp. 215-216 [607 A.2d at pp. 1280-1281] [applying New Jersey law, but speaking generally]).

[22]To the extent that Buss may be understood to argue that, in and of itself, the insurer's right of reimbursement will undermine the defense the insured receives by chilling the representation its counsel provides, for the reasons stated in the text he fails to persuade. His complaint appears to go ultimately to Civil Code section 2860, which in subdivision (d) imposes a "duty" on both the insured and its counsel "to disclose to the insurer all information concerning the action except privileged materials relevant to coverage disputes . . . ." It misses the mark here.

defend the "mixed" action *in its entirety*, i.e., as to both the claims that are at least potentially covered and also those that are not. This obligation does not arise out of the policy, but is imposed by law in support thereof. To defend meaningfully, it must defend immediately. To defend immediately, it must defend entirely. It cannot parse the claims, dividing those are at least potentially covered from those that are not. To do so would be time consuming. It might also be futile. In view thereof, the insurer will presumably take the safer course of defending the entire "mixed" action and then seeking reimbursement for defense costs that can be allocated solely to the claims that are not even potentially covered.[23]

Buss also argues that subjecting the insurer seeking reimbursement for defense costs to a burden of proof no heavier than proof by a preponderance of the evidence improperly transforms the insurer's duty to defend the entire "mixed" action in substantial part. We have reaffirmed this duty. We see no transformation thereof. Recall the analysis presented earlier. As to the claims that are at least potentially covered, the insurer gives, and the insured gets, just what they bargained for, the mounting and funding of a defense. But as to the claims that are not, the insurer may give, and the insured may get, more than they agreed, depending on whether defense of these claims necessitates any additional costs. For any such costs, the insurer may obtain reimbursement. Buss maintains that, because this is so, as to the claims that are not even potentially covered, the duty to defend is changed retroactively into an obligation merely to "advance" a "loan." It is not. It remains what it was—a duty to mount and fund a defense. In any event, the reality is this: The insurer has paid the underlying sums for the insured's benefit; it may demand that they be repaid. Surely, even if the policy's language were unclear, the hypothetical insured could not have an objectively reasonable expectation that it was entitled to what would in fact be a windfall.[24]

Buss finally argues that subjecting the insurer seeking reimbursement for defense costs to a burden of proof no heavier than proof by a preponderance of the evidence is inconsistent with Civil Code section 2860. Not so. Civil Code section 2860 simply "clarifies and limits" *San Diego Federal Credit*

---

[23]Notwithstanding Buss's assertion, we see nothing in the analysis presented in the text that could change the insurer's duty to defend the entire "mixed" action into an obligation merely to *pay* defense costs *only* as to the claims that are at least potentially covered—similar to that of a standard directors' and officers' liability insurance policy (e.g., *Helfand* v. *National Union Fire Ins. Co.* (1992) 10 Cal.App.4th 869, 879 [13 Cal.Rptr.2d 295]). Indeed, we have reaffirmed the duty to *defend*—i.e., to mount and fund a defense—and to defend *entirely*—i.e., as to both the claims that are at least potentially covered and also those that are not.

[24]To the extent that Buss may be understood to argue that, in and of itself, the insurer's right of reimbursement improperly transforms its duty to defend the entire "mixed" action in substantial part, for the reasons stated in the text he fails to persuade.

*Union* v. *Cumis Ins. Society, Inc., supra,* 162 Cal.App.3d 358. (6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 1139, p. 560.) It has nothing to do with the matter at hand.[25]

### III

On Buss's petition for writ of mandate, the Court of Appeal was presented with the question whether the superior court erred when it denied his motion for summary judgment against Transamerica's cross-complaint for reimbursement for the costs it expended to defend the H & H Sports action other than as to the defamation cause of action.

■ At the threshold, the Court of Appeal determined that the superior court's denial of Buss's summary judgment motion was subject to independent review. It was right. Rulings on such motions are examined de novo. (E.g., *Campanano* v. *California Medical Center* (1995) 38 Cal.App.4th 1322, 1327 [45 Cal.Rptr.2d 606]; *Iverson* v. *Muroc Unified School Dist.* (1995) 32 Cal.App.4th 218, 222-223 [38 Cal.Rptr.2d 35].) Including, of course, denials. (E.g., *Bixler* v. *Goulding* (1996) 45 Cal.App.4th 1179, 1187 [53 Cal.Rptr.2d 246]; *Union Bank* v. *Superior Court* (1995) 31 Cal.App.4th 573, 579 [37 Cal.Rptr.2d 653].)

On the merits, the Court of Appeal found the superior court's denial of Buss's summary judgment motion to be free from error. It was right here as well. Considered in their full context, as disclosed by the motion's supporting papers, Transamerica's comprehensive and commercial general liability insurance policies did not either one of them provide that Transamerica had a *contractual* duty to defend Buss in a "mixed" action in its entirety. The policies' language is clear. The duty to defend did not exist in the air, without regard to whether or not the claims were at least potentially covered. To be sure, as to the claims that were at least potentially covered, Transamerica had been paid premiums by Buss for a defense. But as to those that were not, it had not. Even if the policies' language were not clear, there is no

---

[25]To the extent that Buss may be understood to argue that, in and of itself, the insurer's right of reimbursement is inconsistent with Civil Code section 2860, for the reasons stated in the text he fails to persuade. Civil Code section 2860 speaks of the insurer's obligation to pay. It is altogether silent on the insured's freedom to avoid repayment.

From *Hogan*'s "undeniable evidence" language, the Court of Appeal below derived the rule that, when the insurer has wrongfully refused to defend the insured, it may obtain reimbursement for defense costs only if it can "come forward with sufficient evidence to support a motion for *summary judgment*." (Italics in original.) Whether such a rule is sound is a question for another day, when we are faced with an insurer that has so misconducted itself.

appreciable evidence that, at formation, Transamerica believed that Buss understood the words to state or imply a duty to defend an entire "mixed" action, or that Buss had objectively reasonable expectations that they did. Of course, the law imposed a *prophylactic* duty on Transamerica to defend Buss in a "mixed" action in its entirety. And, in the H & H Sports action, Transamerica did so. As to the defamation cause of action against Buss, which was at least potentially covered, Transamerica gave, and Buss got, just what they bargained for, the mounting and funding of a defense. But as to all or at least most of the others,[26] which were not, Transamerica may have given, and Buss may have gotten, more than they agreed, depending on whether defense of these causes of action necessitated any additional costs. Even if the language of the policies were unclear, Buss could not have had a reasonable expectation that he was entitled to what would in fact be a windfall. Whether Transamerica will be able to carry its burden of proof by a preponderance of the evidence that specific costs can be allocated solely to the causes of action that were not even potentially covered is far from plain. But there is at least a triable issue of material fact that it can. It must be allowed the attempt.[27]

## IV

For the reasons stated above, we conclude that we must affirm the judgment of the Court of Appeal.

[26]Whether the "subsidiary" cause of action for wrongful eviction was at least potentially covered is an open question, which we need not, and do not, answer. In concluding that it was not (see fn. 7, *ante*), the Court of Appeal rested on the superior court's determination (see fn. 4, *ante*) that, in light of the "known facts," this cause of action "did not constitute wrongful eviction *as a matter of law*." (Italics added in place of underscoring in original.) But it ignored its related determination that it was "facially covered."

[27]We note that the Court of Appeal assumed that, in order to obtain reimbursement for defense costs, the insurer must reserve its right thereto. To the extent that this right is implied in law as quasi-contractual, it *must* indeed be reserved. (Cf. 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 92, p. 123 [stating that, "[i]n an action in quasi-contract . . . , a *demand* is ordinarily a necessary prerequisite" (original italics)].) Through reservation, the insurer gives the insured notice of how it will, or at least may, proceed and thereby provides it an opportunity to take any steps that it may deem reasonable or necessary in response— including whether to accept defense at the insurer's hands and under the insurer's control (see fn. 9, *ante*; see also fns. 2 & 3, *ante*) or, instead, to defend itself as it chooses. To the extent that this right is implied in fact in the policy as contractual, it *should* be reserved. Through reservation, the insurer avoids waiver. (See *Val's Painting & Drywall, Inc.* v. *Allstate Ins. Co.*, *supra*, 53 Cal.App.3d at pp. 586-587.) Here, Transamerica reserved all its rights, contractual and otherwise.

We also note that the Court of Appeal was evidently of the view that the insurer can reserve its right of reimbursement for defense costs by itself, without the insured's agreement. Such a view is in accord with the "modern trend." (*Walbrook Ins. Co. Ltd.* v. *Goshgarian & Goshgarian*, *supra*, 726 F.Supp. at p. 783.) More important, it is sound. Because the right is the insurer's alone, it may be reserved by it unilaterally. Not only did Transamerica reserve all its rights, contractual and otherwise. But, receiving consideration, Buss agreed thereto.

It is so ordered.

George, C. J., Baxter, J., Werdegar, J., Chin, J., and Brown, J., concurred.

**KENNARD, J.,** Dissenting.—The majority holds that under a comprehensive general liability (CGL) policy, an insurance carrier that has defended its insured in a third party action seeking damages potentially within the policy's indemnity coverage may thereafter require the insured to reimburse the carrier for some of its defense costs despite the absence of any agreement between the carrier and the insured permitting such reimbursement. To justify this result, the majority, without attempting to analyze the relevant policy language, simply asserts that the carrier's contractual obligation to defend extends only to the defense of particular claims, not to the defense of entire actions, and therefore the insurer may obtain reimbursement for the cost of defending claims that are outside the defense obligation. Because this reasoning is irreconcilable with clear and explicit policy language obligating the insurer to defend suits, rather than individual claims, and because it is settled law that clear and explicit provisions of insurance policies should be enforced as written, I dissent.

This court recently used these words to explain how courts are to go about the interpretation of insurance policies: "Insurance policies are contracts and, therefore, are governed in the first instance by the rules of construction applicable to contracts. Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs its interpretation. (Civ. Code, § 1636.) Such intent is to be inferred, if possible, solely from the written provisions of the contract. (*Id.,* § 1639.) The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' controls judicial interpretation unless 'used by the parties in a technical sense, or unless a special meaning is given to them by usage.' (*Id.,* §§ 1638, 1644.) If the meaning a layperson would ascribe to the language of a contract of insurance is clear and unambiguous, a court will apply that meaning. [Citations.]" (*Montrose Chemical Corp.* v. *Admiral Ins. Co.* (1995) 10 Cal.4th 645, 666-667 [42 Cal.Rptr.2d 324, 913 P.2d 878].)

Under a standard form CGL policy, the insurer undertakes two obligations in exchange for the insured's premium payments: an obligation to *indemnify* the insured against liability for specific types of covered damages and an obligation to *defend* the insured in any "suit" seeking such damages. To discharge its defense obligation, "the carrier must defend a suit which *potentially* seeks damages within the [indemnity] coverage of the policy."

(*Gray* v. *Zurich Insurance Co.* (1966) 65 Cal.2d 263, 275 [54 Cal.Rptr. 104, 419 P.2d 168], original italics.) Thus, the defense and indemnification obligations are related, but the duty to defend is "independent of the indemnification coverage" (*Gray* v. *Zurich Insurance Co., supra,* at p. 274), and "the duty to defend is broader than the duty to indemnify" (*Horace Mann Ins. Co.* v. *Barbara B.* (1993) 4 Cal.4th 1076, 1081 [17 Cal.Rptr.2d 210, 846 P.2d 792]).

The language of the two CGL policies at issue here is typical. In both, the insurance carrier's indemnity obligation extends to liability for personal injury and advertising injury. Under the earlier policy, the carrier assumed the "duty to defend *any suit* against [the insured] seeking damages on account of such injury." (Italics added.) Under the later policy, the carrier assumed the "duty to defend *any 'suit'* seeking those damages" (italics added), and the policy defined "suit" as a "civil proceeding." By using the words "suit" and "civil proceeding" the policy clearly and explicitly extends the defense obligation to the defense of entire actions, and not individual claims. Under the rules of insurance policy construction recited above, this clear and explicit meaning must be given effect.

As the Attorney General points out in his amicus curiae brief for the State of California, provisions in a standard form CGL policy obligating the insurer to defend the entirety of a suit seeking any covered damages are not the product of happenstance. Rather, they are a logical reflection of insurance carriers' pursuit of their own interests. If the policy obligated the insurer to defend only against "claims" seeking potentially covered damages, rather than against "suits" seeking such damages, then the carrier and the insured would have to undertake defense of the suit jointly, with each represented by a different attorney. Division of the defense in this manner would compromise the insurer's control over the third party litigation, and consequently its control over its own indemnity exposure. To avoid this result, CGL carriers have sought complete control over any litigation against the insured that potentially seeks damages covered by the indemnity provision. To prevent the insured from retaining counsel who might interfere with the insurer's control of the defense of third party actions against the insured, insurers have phrased the defense obligation in terms of "suits" seeking potentially covered damages rather than in terms of individual claims for such damages. Thus, the obligation to defend the entirety of any suit seeking potentially covered damages represents a logical quid pro quo. In exchange for the added expense of defending claims not potentially covered, the insurer acquires a freer hand and enhanced control in the defense of those claims that are potentially covered.

Although California case and statutory law have imposed limits on the ability of liability insurers to control third party litigation against the insured (see, e.g., Civ. Code, § 2860; *San Diego Federal Credit Union* v. *Cumis Ins. Society, Inc.* (1984) 162 Cal.App.3d 358, 369 [208 Cal.Rptr. 494, 50 A.L.R.4th 913]), CGL carriers have not responded to this changed legal climate by altering the scope of their defense obligation. Redrafting the standard policy language to narrow the defense obligation would not be particularly difficult. A model for such a restriction could be found in the standard title insurance policy, which describes the insurer's defense obligation this way: "[T]he Company, at its own cost and without unreasonable delay, shall provide for the defense of such insured in litigation in which any third party asserts a claim adverse to the title or interest as insured, but only as to those stated causes of action alleging a defect, lien or encumbrance or other matter insured against by this policy. . . . The company will not pay any fees, costs or expenses incurred by an insured in the defense of those causes of action which allege matters not insured against by this policy." (Cal. Title Insurance Practice (Cont.Ed.Bar 2d ed. 1997) p. 533, appendix E, quoting California Land Title Association Standard Coverage Policy (1990) pt. II, ¶ 4(a).) By stating their defense obligation in terms of defending particular causes of action, rather than entire suits, title insurers have done what insurers issuing standard CGL policies have not done—limited their contractual defense obligation to the defense of potentially covered claims.

The majority pays lip service to the general rules of construing insurance policies (maj. opn., *ante*, at pp. 44-45), but makes no attempt to apply these general principles to the policies at issue in this case. Instead, the majority repeatedly states that an insurer merely has a duty to defend any *"claim"* that potentially falls within the obligation to indemnify. (Maj. opn., *ante*, at pp. 46, 47, 48, 49, 50, 51.) It ignores the explicit language of the policies here, under which the insurer agreed to defend not merely any *claim* but any *suit* in which there is a potential for indemnity coverage.

That the defense obligation under the policies expressly extends to "suits" rather than "claims" is not even mentioned in the majority's discussion of the scope of the insurer's duty to defend. Instead, the majority relies on a " 'general rule' that '[w]hen a complaint in an action . . . states different causes of action . . . against the insured, one of which is within . . . coverage . . . and others of which may not be, the insurer is bound to defend *with respect to those which, if proved, would be within . . . coverage.'* " (Maj. opn., *ante*, at p. 48, italics in maj. opn.)

The majority's reliance on this "general rule" is misplaced for at least three reasons. First, the "general rule" as quoted states only that insurers

must defend with respect to claims that are potentially within the indemnity coverage; it does *not* state that insurers *need not defend* with respect to other claims in the same action. As the majority acknowledges, an insurer indeed must defend *all* claims in the action. Second, the quotation is not from a statute, constitutional provision, or appellate decision having precedential value, but from a 1955 annotation in the American Law Reports. The majority never explains what chain of reasoning or source of legal authority justifies this court's adoption of this "general rule" it has found in a legal commentary. Third, and most important, whatever validity this "general rule" may have in construing an insurance policy that does not describe the scope of the insurer's duty to defend, general rules of construction cannot override express policy language to the contrary. Here, the insurer *expressly* agreed to defend not merely individual covered claims, but any suit seeking damages covered by the policies. Once an insurer has made such an agreement, it is obligated to honor it, regardless of how costly this may prove in a particular instance. (See *Butler* v. *Nepple* (1960) 54 Cal.2d 589, 599 [6 Cal.Rptr. 767, 354 P.2d 239] [stating that it is no excuse to a claim for breach of contract that performance would have been more expensive than anticipated].) This court should not adopt "general rules" that permit an insurer to avoid its contractually imposed obligations or to shift the cost of performance to the insured.

The majority also makes this assertion: "We cannot justify the insurer's duty to defend the entire 'mixed' action contractually, as an obligation arising out of the policy, and have never even attempted to do so." (Maj. opn., *ante*, at p. 48.) With this one extraordinary sentence, the majority summarily dispenses with any consideration of the policy language at issue here or the rules this court has previously established for construing contracts in general and insurance policies in particular. Applying those rules to the policy language at issue leads to but one conclusion, as I have explained above: The insurer must, at its own expense and without any claim for reimbursement, defend the whole of what the majority chooses to call a "mixed action." Had the majority made, rather than declined, the attempt to interpret the contract of insurance, it could have reached no other conclusion.

Insurance policies are written contracts governed by the rules of contract law, not equity or quasi-contract. "The rules governing policy interpretation require us to look first to the language of the contract in order to ascertain its plain meaning or the meaning a layperson would ordinarily attach to it." (*Waller* v. *Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18 [44 Cal.Rptr.2d 370, 900 P.2d 619].) When a CGL policy uses language obligating

the insurer to defend "any suit" seeking potentially covered damages, without reserving a right to reimbursement from the insured, the insurer at its own cost must defend the entirety of any action against the insured seeking potentially covered damages. Because the majority holds otherwise, I dissent.